[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceeding
On April 30, 1997, twenty-seven month old Samantha B., who had spent none of her life with either of her biological parents, became the subject of this petition by which her legal guardian, the Department of Children and Families (DCF), seeks to terminate the parental rights of Evelyn M. and Jason B, her mother and acknowledged father, so that she could secure a permanent home through adoption. The sole ground alleged for terminating the mother's parental rights[1] was her failure to rehabilitate within the meaning of subsection (c) of Sec. 17a-112 of the Conn. Gen. Stats. (Rev. 1997):
 the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child;
The initial hearing was not scheduled in the court location at which it was filed until June 17, 1997, notwithstanding the applicable statutory requirement that ". . . the time for hearing shall be not more than thirty days after the filing of the petition." Sec. 45a-716(a), incorporated by reference into Sec. 17a-112, subsection (b) for all cases concerning children previously committed to DCF as neglected or uncared for under Sec. 46b-129, subsection (d). Like the time parameters for filing petitions to extend commitments 90 days prior to the expiration of such commitments, the "shall" in Sec. 45a-716 (a) is deemed directory rather than mandatory, under the reasoning of In Re Adrien C., 9 Conn. App. 506, 510-512 (1987). The mother's failure to object to this late scheduling of the initial hearing thus constitutes a waiver of any right she might have had to do so. Id., at 511-512.
Two months after the initial hearing, the petitioner's oral motion to amend to add consent as grounds for terminating the father's parental rights was granted by agreement, and the court, after canvassing Jason B., found his consent, having been made voluntarily, knowingly and with the advice of counsel, to be a valid ground for terminating his parental rights. The allegation of Evelyn's failure to rehabilitate as grounds for terminating CT Page 13219 her parental rights, so as to free the child for adoption, remained contested and was transferred for trial to the Child Protection Session of the Superior Court sitting at Middleton.
At the outset of the initial trial date of October 14, 1997, the court found the mother competent to participate in the trial, based upon an evaluation performed by psychiatrist Dr. Richard Sadler. (Testimony of October 24, 1997, Court's Exh. 1.) On that date, and on a final date two weeks later, the mother appeared, represented by the same attorney who had represented her since DCF first took custody of Samantha shortly after her birth.
At the conclusion of trial, closing arguments were made on the record in lieu of counsel submitting written trial memoranda. The adjudicatory date is thus April 30, 1997, the date the petition was filed under Practice Book Sec. 1042.1, subsection (4)[1]; the dispositional date is October 28, 1997, the same date on which decision was reserved.
Facts
Evidence offered at trial interpreted in the light of the prior record in this court concerning Samantha and judicial notice taken of all court actions affecting her which preceded initiation of this action, supports the following findings of fact:
Samantha was conceived one month after her acknowledged father, Jason B., was arrested for risk of injury, based upon allegations of sexual abuse of several children. He subsequently was convicted and sentenced to probation until January 3, 2000, conditioned upon his having no unsupervised contact with any child under the age of sixteen. (State's Exh. 2, pp. 7-8.) Samantha was born on January 20, 1995 at 26 weeks gestation, weighing approximately twenty ounces. She remained in hospitals with a variety of respiratory and eating difficulties until she stabilized sufficiently to be placed into a specialized foster home on September 2, 1995, where she has remained until the present.
A referral was made to DCF when the infant was only three weeks old because of concerns of hospital staff about the mother's ability to care for the child based upon their observations of her intellectual limitations, and her plan to CT Page 13220 take the baby to live in the home where she then lived with her mother and brothers, one of whom, she reported, was retarded and had physically abused her in the past. Evelyn also expressed her disbelief that Jason had committed the acts for which he was convicted, did not believe he would present any risk of danger to Samantha in the future, and planned to marry him and make a home with him for the baby. (Id., p. 7.) In late March, hospital staff complained to DCF that Evelyn repeatedly overstimulated this fragile baby, causing "severe distress". (Id. P. 8.) Overstimulation increased her difficulty breathing, causing her to turn blue. The staff nurse was concerned when Evelyn asked her, "Does she stand on her head, because her father does that?" She did not appear to understand how difficult it was to get nutrition into Samantha or avoid temporary asphyxiation, claiming that she knew how to care for children because of having taken care of nephews and nieces. She became increasingly agitated when told that DCF would be seeking temporary custody, and after telling the DCF social worker that she would "rather see her daughter dead than in foster care" and that she "meant it", hospital staff requested that DCF obtain temporary custody since the hospital could not provide constant supervision during parental visits. On April 19, DCF obtained a 96-hour administrative hold so that the agency could ensure supervision during all such visits, and the next day filed a neglect petition with the Superior Court and obtained an Order of Temporary Custody (OTC). Following a contested hearing on June 5 on the necessity for an OTC under these circumstances (See In ReJuvenile Appeal (83-CD), 189 Conn. 276, 289, (1983) for criteria), the court confirmed the OTC, enabling the child to be placed directly into a specialized foster home when ready to leave the hospital three months later. On January 29, 1996, following receipt of a psychological evaluation conducted by Dr. Robert Meier, the parents entered nolo pleas to the allegation that the child was uncared for within the sense of having specialized needs that could not be met in the parental homes, based upon the inability or unavailability of both parents to meet the extraordinarily specialized physical and developmental needs of this premature baby. The court also found the child to have been neglected by the mother for failing to provide Samantha with proper care and attention. The factual basis for this finding does not appear from the voluminous pleading inaccurately captioned a "Summary of Facts", being neither presented in summary form nor confined to factual statements but rather appearing to be the social worker's chronological narrative of every contact with parents, other relatives and hospital staff CT Page 13221 from the first referral in February to the filing of the petition on April 20. (A copy is appended hereto as "Appendix A.") The only well pleaded facts on which a finding of neglect could be based following the mother's nolo plea would be the repeated incidents, during visits, of overstimulating the baby, despite reiterated cautions from hospital staff, resulting in her increased difficulties in breathing. (Appendix A, p. 10.)
Following this adjudication in January, the matter was further continued as to dispositional issues until March 13, 1996 — nearly twelve months after DCF secured temporary custody — when Samantha was committed to DCF for an initial period of twelve months. Separate written expectations were spelled out by the court as a guide to improving the chance for each parent ". . . to regain guardianship of your child permanently" and containing the warning: "Failure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption". The expectations for the parents were identical except in one respect. Both were required to keep appointments with DCF, to visit as often as permitted, to engage in both parenting and individual counseling and secure adequate housing and source of income. In addition, Evelyn was expected to "cooperate and follow the recommendations of Samantha's health care providers" while Jason was "to comply full with the terms and conditions of his probation". Although both parents were present at the hearing where these expectations were articulated, neither they nor their attorneys signed the list indicating their understanding thereof. A timely filed petition to extend Samantha's commitment was scheduled to be heard on March 4, 1997, but a continuance was requested by the mother's counsel. Because the continued date was after the expiration of the original twelve month commitment, the court continued the child's commitment nisi pending further hearing thereon. On the continuance date, however, neither mother's attorney nor herguardian ad litem were able to attend, but both agreed to continuing the commitment pending a case status conference on the extension. A month before that conference, set for May 29, 1997, could be convened, however, DCF had filed the instant termination petition. At the initial hearing thereon, the case was referred directly to the Child Protection Session in Middletown for trial both petitions: for extension of commitment and for termination of parental rights.
In the two years between the assumption of custody by DCF and CT Page 13222 the date this petition was filed, no perceptible change in Evelyn's circumstances took place: She continues to live with her mother and brothers, including the one with whom she had had physical altercations in the past. (State's Exh. 2, p. 4.) She continues to be unemployed, supported by city welfare. She participated in a psychiatric evaluation recommended by Dr. Meier, but did not follow through with the further testing recommended by the psychiatrist. She has received parenting training, but demonstrates minimal progress in understanding the highly specialized needs of Samantha who, at two, while less fragile than she was in infancy, still requires an extraordinary degree of responsiveness and care.
The mother has consistently maintained the permitted schedule of supervised visitation, but has not demonstrated a sufficient understanding of the child's special medical and development needs to be entrusted with her care, even momentarily, without supervision. Initially, the visits took place weekly at the DCF office. Later, visits took place at the Smith-Bent Agency where, despite repeated instruction, she continued to handle the child too roughly for Samantha's developmental level: Once she tried to make the baby crawl; another time she insisted the baby could speak in full sentences, yet another time she reported that the baby could change the color of her eyes at will, and she repeatedly misused a toy car that could have injured the baby's legs. Smith-Bent discontinued supervising visits in March of 1997 after an episode when Evelyn, despite repeated protests, insisted on ascending a stairway holding Samantha in one arm and risking a head injury. When told to relinquish the child, she continued to grasp her in one arm while descending the same stairway.
Other assistance was offered but brought no improvement in Evelyn's ability to provide Samantha with an appropriate and safe home: She was referred to a Parent Aide but was rejected as being "unready" for such services. She was given a list of subsidized housing apartments but was rejected because of her poor credit history and also because she had no motivation to leave her mother's home, despite the history of domestic violence there, She also insisted that she could not live alone anywhere because she was subject to periodic blackouts but did not pursue recommended further evaluation or treatment for this condition. She was notified of and attended all non-emergency medical appointments but appeared to show no more understanding of Samantha's continuing developmental problems than she had two CT Page 13223 years earlier. E.g. While Samantha no longer requires a feeding tube, she remains difficult to feed, often choking and requiring the EMT skills of her foster mother. At the age of two she does not yet walk or talk. Evelyn also faithfully attended appointments with the physical and occupational therapists, but they objected to her continually interfering with their attempts to work with the child, rather than just observing as she was requested to do.
As the visits continued, Samantha became increasingly distressed in her mother's presence, engaging in "very atypical behavior", according to Mary White, Samantha's Early Connections teacher. She would pull at her clothes, acted fidgety, and was reluctant to play with toys or accomplish the tasks set for her by the teacher. As a result, Ms. White recommended in a letter dated May 15, 1997, that Evelyn should no longer visit during sessions with the teacher. (State's Exh. 4.) Kathleen Smith, the Licensed Clinical Social Worker who observed mother-child interactions between December of 1995 and March of 1997, concluded that even under supervision, the mother was incapable of keeping the child safe, despite Samantha's needs changing over time. For example, when Samantha was an infant, despite repeated instruction Evelyn could not remember to support the child's wobbly head. Later, when that was no longer a problem and Samantha began to crawl and pull herself up, despite repeated instruction, Evelyn would pick her up by jerking at her arms and insisted on carrying her on one arm.
The foster mother, a paramedic, testified that the child continues to be a tricky eater, prone to choking which requires immediate appropriate paramedical intervention. If Samantha were free to be adopted, she would like to be the adoptive parent.
Testifying on her own behalf, Evelyn insisted that she could meet all of Samantha's needs, but offered no evidence in corroboration.
FINDINGS
The facts found above constitute clear and convincing proof of the following:
1. DCF made all reasonable efforts to reunify Samantha with her mother, but Evelyn appears to be not unwilling but incapable of benefiting from reunification efforts. CT Page 13224
2. Termination of her mother's parental rights is necessary to secure the best interests of this child so that she may be adopted by the foster mother who has demonstrated for two years her ability to meet the special medical, educational and developmental needs which this child still has, and may be predicted to have for a long time, considering the extraordinarily fragile condition in which she entered the world as a one-pound, six-months-gestation infant.
3. Over an extended period of time, starting with the child's first eight months of life spent in hospitals, and then for the next two years in foster care, despite repeated efforts by a large number of professionals, Evelyn ". . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . [she] could assume a responsible position in the life of the child;" [Emphasis added.] Evelyn appears to have done all that she was capable of doing in keeping appointments and visits and attending meetings. But the ultimate test of failure to rehabilitate is not whether a parent has gone through the motions of complying with court and agency expectations, but rather whether such compliance has made her more capable of providing adequately for her child on the adjudicatory date (here, April 30, 1997) than she was when her child was placed in DCF custody. The evidence here is overwhelming that Evelyn is no more capable on the adjudicatory date than she was in March of 1996 when her daughter was committed, or than she was in April of 1995 when DCF first assumed custody, or in February of 1995 when the hospital first referred the family to DCF because of Evelyn's apparent inability, at that time, to learn appropriate caretaking of this unusually fragile baby. The record is devoid of any evidence that her abilities on the adjudicatory date were significantly improved. Terminating a parent's rights is not ordered to punish a parent who has not tried to rehabilitate; it is ordered so as not to punish a child by denying her a safe permanent home with proven competent caretakers because her biological mother has tried hard but continues to be incapable of providing such a home for her. Evelyn may well be able to care for children of normal physical and developmental abilities, but the basis of this adjudication is her "rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation . . . [is] foreseeable `within a reasonable time.'" In re Luis C., 210 Conn. 157, 167 (1989); cited with CT Page 13225 approval In Re Christina V., 38 Conn. App. 214, 221 (1995).
Mandatory Findings
Before a court may order termination of a parent's rights, it must consider the seven factors enumerated in subsection (e) of Sec. 17a-112:
1. DCF offered all appropriate services to Evelyn to prepare her for assuming care of her daughter. She was provided with regular visitation, invited to medical appointments, permitted to be present at sessions with physical and occupational therapists. Were Samantha's problems less complex, or were Evelyn more psychologically and intellectually capable of absorbing what needs to be understood about meeting the child's special needs, adherence to these schedules of visits and appointments should have been more than adequate to prepare the family for being united. But the child's problems are enormously complex and continuing, and Evelyn, despite her presumably best efforts, appears to be incapable of learning and putting into practice the specialized care which the child's needs require.
2. DCF made reasonable efforts to reunite mother and child. Evelyn was accorded an unusual degree of access to the child, at weekly visits and additional contacts at medical and therapists' appointments. DCF also tried to secure a more appropriate living situation for Evelyn, but she either would or could not pursue such referrals.
3. While not orders, and while not signed by Evelyn or her attorney, the court's expectations were largely complied with. Evelyn did cooperate with a psychiatric evaluation, although she did not follow through with the recommendations of the psychiatrist that she undergo further testing because of the possibility that some kind of medication might render her more capable of understanding her child's needs and learning how to meet them. No evidence was offered that such medication, if any were indicated, could have effected sufficient change in Evelyn to enable her to assume the child's care within a time frame that this child could afford to wait.
4. No clinical evaluation of the relationship between Samantha and her mother, and between Samantha and her foster mother was conducted. Testimony of the teacher and the clinical social worker, both of whom observed visits over a period of time, permits an inference that contact with the mother is a CT Page 13226 source of anxiety for Samantha, while the presence of the foster mother is a source of comfort.
5. Samantha is almost three years old, although, because of her extreme prematurity, she is developmentally more like a two year old. But whether two or three, Samantha has spent her entire life, outside of the hospital in which she was born, with a single caretaker who is committed to her for life and who has demonstrated her ability to meet her needs. Foster care should be a strictly time-limited interval in the life of any child. The Federal Adoption Assistance and Child Welfare Act of 1980, as amended, envisages that after twelve months in foster care a child deserves a permanent home. Samantha has been in foster care for twenty-two months. She deserves a permanent home without further delay.
6. Evelyn has made consistent externally observed efforts to change her circumstances to make it in Samantha's best interests to be placed in her care. Whether these efforts consisted of more than merely keeping appointments is not apparent from this record. Whether she has made sincere efforts, within her ability, or whether she has merely gone through the motions, the ultimate test is whether she, in fact, has changed her ". . . circumstances, conduct or conditions . . ." sufficiently to make it in the best interests of the child to be placed with her. All of the witnesses called by the petitioner were clear in their conclusion that no such change has taken place. No professional witnesses were called by the respondent to refute such testimony.
7. Nothing has prevented Evelyn from maintaining a meaningful relationship with the child. Evelyn was not living with her mother and brothers because of her economic condition, but because she did not feel capable of living on her own. Her visits were frequent (weekly) and regular. The lack of a meaningful relationship is not due to any unreasonable interference by DCF but rather to Evelyn's own deficits that made her reactions and interactions with her daughter inappropriate from the time of the child's birth to the dispositional date of October 28, 1997.
ORDERS
Based upon the findings which have been made by clear and convincing evidence listed at pp. 7-8 supra, and considering the seven factors enumerated above, it is ordered that the parental CT Page 13227 rights of Jason B., based on his consent accepted by the court on August 8, 1997, and of Evelyn M., because of her failure to rehabilitate within the meaning of Sec. 17a-112 elaborated above, be, and they hereby are, terminated, and that the Commissioner of DCF is hereby appointed Statutory Parent for the purpose of placing the child forthwith in adoption. To ensure the timely achievement of this end, the Commissioner is further ordered to submit to this court within 90 days of the date of this Memorandum a written report as to the progress toward such adoption. If adoption is not finalized within one year from the date of this Memorandum, such Commissioner is further ordered to submit a Motion for Review of Terminated Child no later than January 15, 1999, to be docketed and heard no later than one year following submission of the 90-day report.
 Note on the Extension Petition: Because the parents' rights are terminated by these orders, there is no need at this time to act further on the petition seeking extension of Samantha's commitment which was granted nisi on March 14, 1997. In the event that an appeal is taken from this judgment, it is ordered that the child's commitment be extended until final resolution of such appeal. If the petitioner should prevail on appeal, no further petitions to extend commitment need be filed, although Motions to Review Plans for Terminated Child must be filed every twelve months until adoption is finalized. If the respondent should prevail upon such appeal and this order of commitment reversed or remanded, the commitment shall be deemed to be extended for a period of ninety days following the decision on appeal, with the Commissioner ordered to submit a further petition to extend commitment immediately thereafter, to be heard and acted upon before expiration of those ninety days.
Entered at the Child Protection Session Middletown, Connecticut this 26 day of December, 1997
Frederica S. Brenneman, J.
Appendix A
In Re: Samantha B
Superior Court for Juvenile Matters
869 Norwich-New London Turnpike Uncasville, Connecticut 06382
Date: April 20, 1995
SUMMARY OF FACTS
Date: April 20, 1995
CHILD FOR WHOM PETITIONS ARE FILED:
Samantha B Date of Birth: 1-19-95 Race: Hispanic/Caucasian Religion: Unknown Placement Status: O.T.C.'s pursued 4-20-95
Mother: Evelyn M Date of Birth: Address: Race: Hispanic Religion: Unknown
Father: Jason B Date of Birth: Address: Race: Caucasian Religion: Unknown
REASON FOR PETITION:
CT Page 13229
A referral was received by the Department of Children and Families on February 14, 1995 from Joyce L, Social Worker, Yale-New Haven Hospital. Ms. L. expressed concerns of mother's ability to care for her child, Samantha B. Ms. L. stated that mother was very limited and that mother had stated that her brother, who resides in the home, is abusive to her and her family.
Of additional concern to Ms. L. was that the child's father was arrested and is currently on probation for Risk of Injury Charges. Father was reportedly involved in a strip-poker game with twelve year-olds of unknown gender. The time frame of this incident is unknown. According to referrer, mother has difficulty processing information and she questioned mother's ability to protect her infant. Samantha B. was born at twenty-six weeks of gestation, and Ms. L. felt that the mother needed extensive in-home services and an extensive assessment by the Department of mother's ability to care for her newborn child.
At the time of the call, Samantha B. had been recently transferred to Lawrence and Memorial Hospital in New London to be closer to her parent's home. The child was experiencing respiratory problems, had a low birth weight and weighed 1 lb. 10 oz. at birth. Her future medical care and needs would need to be further assessed.
On 2-15-95, Department of Children and Families Social Worker, Michelle K. made an unannounced home visit to the M. residence. Mother was not there and a family member informed her that she was at the hospital. On that date, Ms. K. went to the hospital, but mother had already left. She did have the opportunity to speak with Lawrence and Memorial Social Worker, Jean W. Ms. W. reported to Ms. K. that mother told her that her brother had been in a group home for mentally retarded persons, but that he had been discharged for beating somebody up. Ms. W. also said that she had been told that mother had been hurt as a result of her brother hitting her. In addition, mother had been living in this apartment with her mother, her brother and another person.
Ms. W. stated that Mr. B. had been arrested on 1-3-95 for Risk of Injury. She stated that to her knowledge he was not to have any unsupervised contact with any children under the age of sixteen. Ms. W. also reported that Pat O. from the V.N.A. had been involved with with the family in the past and prior to the child's birth. Beth L. of the O.B. Clinic at Lawrence and Memorial Hospital had been monitoring mother during her pregnancy. Ms. W. stated that CT Page 13230 housing had been a chronic issue for mother. In the past, she had looked into other housing options, but did not follow through.
On 2-23-95, Department of Children and Families Social Worker Michelle K. met with mother, maternal grandmother, father, and Lenore C., Social Worker for Lawrence and Memorial Hospital. Ms. K. questioned mother about the concerns that were discussed in the referral. Maternal grandmother and mother appeared to minimize the danger that the maternal uncle presented to Samantha. Mother was unable to provide appropriate responses to safeguard Samantha in the event her older brother became angry or abusive. Maternal grandmother reported that mother's brother would never be able to live on his own and was not involved in any services at the present time. There appeared to be a number of people living in the home including maternal grandmother, Ms. M. Jeffrey M., David M., (her brothers) and her husband, Steve M.
On 2-23-95 Ms. M. told Ms. K., "I flipped out last night when the baby turned blue." Ms. C., Social Worker, reported that there are episodes when the baby does not breath and turns blue. Maternal grandmother at that point, expressed concerns about mother's ability to care for the child on her own.
In speaking with Mr. B. he admitted on 2-23-95 to Ms. K. that he was convicted of risk of injury to children, but did not want to provide the department with details of his conviction. He provided the name of his probation officer and that he attended counseling every other Friday. He discussed being court-ordered not to have contact unsupervised with children under age sixteen.
Ms. M. fluctuated from saying that she was going to follow the rules of his probation regarding supervised contact with children to stating that she would bend the rules where the baby is concerned. She failed to acknowledge the potential risk he presented to Samantha. Mother also stated that she had been in counseling in the past when her supervisor at Caldors made her go. Upon further questioning, mother disclosed that she had bruises on her that were inflicted by father which she described occurred from having been "wrestling with him." It was her supervisor's recommendation that she engage in counseling. Mother would not disclose any further information regarding the bruises. Mother stated that she did not feel that she needed counseling at the present time, but was encouraged by the department to pursue individual counseling.
On 2-23-95, Ms. C., Lawrence and Memorial Social Worker, expressed her CT Page 13231 concerns about mother's inability to set priorities. Mother appeared to lack the understanding of how her relationship with Mr. B. presented a risk to Samantha. Maternal grandmother also lacked the understanding of the seriousness of Mr. B. charges and the risks that he presented to Samantha if not supervised at all times while in her presence.
Department of Children and Families Social Worker Michelle K. contacted Charles D., Mr. B. Probation Officer. He stated that father was convicted on two counts of risk of injury charges. He was involved in the incident with another adult: Mr. B and the other adult reportedly played a game of strip poker with several children. This particular game involved the children being undressed and "grabbing and squeezing them." The incident occurred on 6-22-94. On 1/3/95, Mr. B. was convicted of these counts of risk of injury and was placed on probation. The terms of his probation are the following; no contact with the victim or the victim's family, no unsupervised contact with other children under the age of 16, participation in a sex offender's counseling program, maintain full time employment, and pay any out of pocket expenses in terms of counseling for the victim. Mr. D. further stated that any responsible adult, a member of D.C.F., hospital staff, etc. would be able to provide the supervision during visits with his daughter.
Mr. D. further reported on 3-13-95, that father had been physically abusive to mother in the past, and is very controlling and manipulative. Mr. D. stated that father was instructed not to have any contact with Ms. M. other than concerning issues of the child. Father was told that if he were to get into any situation where he threatens mother or is physically assaultive to her, the police would be contacted and he would be arrested. Mr. B. will be on probation until 1-3-2000. Mr. B. is seeing George B. of Special Services in Middletown every other Friday for sexual offender counseling. Ms. M. stated to Mr. D. that Mr. B. has a very violent temper.
On 3/13/95, Department of Children and Families Social Worker, Michelle K. met with mother, maternal grandmother, and Lawrence and Memorial Social Worker Jean W. at the hospital. Ms. K. questioned mother as to whether or not she had a crib for the baby and mother stated that she did not yet have a crib, but had a few clothes and a couple of baby bottles. Mother and maternal grandmother believed that they could obtain all of the necessary items to care for the baby within a few days of the child going home.
Ms. K. spoke with mother concerning the present terms of father's CT Page 13232 probation and how his past history places Samantha at risk for possible sexual abuse. Maternal grandmother appeared to have no specific knowledge about the details of father's conviction. Mother appeared to have more knowledge of what father had done, but she was quite frank in reporting that she did not believe that he did it. She reported that father was innocent but that his public defender made him plead guilty. After Ms. K. presented them with more information on the circumstances surrounding father's arrest, neither mother nor maternal grandmother presented like they clearly believe that father is capable of harming children. Ms. K. emphasized the need to protect the child from harm and to provide her with proper care. Mother stated that she did not think that father would do anything to hurt the child and that he would commit suicide before he would do anything to harm his child. Ms. M. then stated that her first plan in providing for the family was to marry father and get a place with him.
Mother then discussed how her brother had gone after her with a knife to try to stab her on one occasion. While she was speaking about this, maternal grandmother attempted to kick her in the leg. Ms. K. then discussed the need to come up with a plan to keep Samantha safe should her brother become violent in the home. Mother said, "When he gets violent, he hurts you and there is nothing that you can do." Mother then discussed her past violent episodes with Mr. B. and said that they still argue, but not to the point where he hits her. She reported that he does have a violent temper and will punch in walls. In terms of the past history of sexual abuse, mother stated that father was in the "wrong place at the wrong time." Mother was very hesitant to enter into counseling.
On 3/13/95, mother was referred to counseling to the Community Mental Health Clinic, Lawrence and Memorial Outpatient Mental Health Clinic and Family Service Association.
On 3/13/95, Lawrence and Memorial Social Worker Jean W. called the department and stated that Samantha would remain in the hospital for an additional six weeks.
On 3/27/95, mother contacted the Department of Children and Families Treatment Social Worker, Kathleen F. She questioned if the department planned to take her baby. Ms. F. expressed concerns for Samantha's safety and informed her that we could discuss planning issues at the 4/12/95 Treatment Plan Conference. She said that she did not understand why we were involved with the case to begin with since nobody has harmed the baby. Ms. F. discussed the department's concerns regarding her home CT Page 13233 environment, Mr. B. history, as well as Samantha's special needs. She said that Samantha would be safe with her and that she has a playroom for her to sleep in.
On 3/28/95, Social Worker Kathleen F. spoke with Jean W. Social Worker at Lawrence and Memorial Hospital. Ms. W. stated that she had concerns regarding mother's interaction with the baby. Mother continually overstimulated the baby, causing severe distress to Samantha. Despite continued prompting, Ms. M. continues to overstimulate the baby and does not seem to understand why this is harmful. When Samantha is overstimulated, she has difficulty breathing and her system shuts down, causing her to turn blue. Ms. W. as also extremely concerned because Ms. M. asked a Staff Nurse if the baby had any odd behaviors. The staff nurse was unclear what she meant and Ms. M. stated, "Does she stand on her head, because her father does that?" This raised grave concerns about Ms. M. understanding of child development and her ability to care for Samantha.
On 4-11-95, Social Worker Kathleen F. spoke with Ms. M. about the Treatment Planning Conference. She stated that she intended to be at the conference but once again stated that she did not know why we were involved. Ms. F. went over the concerns with her again, but Ms. M. appeared not to have an understanding of the risks her brother and Mr. B. presented to Samantha. In addition, she did not appear to have a clear knowledge of Samantha's specialized medical needs and stated that she knew how to take care of kids because she had taken care of her nieces and nephews before. Ms. F. stressed the specialized needs that Samantha has and that we need to work together to come up with a plan to meet her needs.
On April 12, 1995, there was a Treatment Plan Conference at the department's office. Present for the conference were: Ms. M., Mr. E., Lawrence and Memorial Social Worker Jean W., Department of Children and Families Social Worker Kathleen F. and Social Work Supervisor Susan W. Ms. F. and Ms. W. expressed our concerns regarding Samantha's safety and her needs. Mother did not appear to have an understanding that Samantha has difficulty bottle feeding and said that Samantha just "plays with her bottle". She also described a large, bright yellow duck that plays loud music. Ms. M. put this in Samantha's isolate, despite being told by Lawrence and Memorial Staff that this was an inappropriate item for the child. Apparently the duck overstimulated Samantha and she had trouble breathing. Ms. F. discussed this with Ms. M. but she insisted that her daughter liked the toy and that it was fine CT Page 13234 for her. Both parents were told of the department's plan to file for Orders of Temporary Custody. Mr. B. was in agreement with the plan, but Ms. M. was emotionally distraught, stating that Samantha would be safe in her mother's home.
Ms. M. had concerns that Samantha would be put up for adoption. Ms. F. and Ms. W. explained clearly to her that a foster home is for temporary care of children while parents have an opportunity to improve their circumstances and learn about child care. Ms. M. did not appear to understand the difference despite numerous attempts to delineate the differences.
On 4/17/95, Ms. M. called Ms. F. and was very upset on the telephone. She continually stressed that her brother and Mr. B. did not present a risk to Samantha and that there was no need for our involvement. She became quite agitated on the telephone and told Ms. F. not to discuss any issues with Mr. F. probation officer because he would lie to the department. She further stated that the probation officer threatened to take the baby out of state. She then said that she knew that the department wanted to take Samantha to collect the money for her. Despite numerous attempts to reason with Ms. M. and explain the exact procedures, she continued to escalate. She stated that she would "rather see her daughter dead than in foster care" and that she "meant it." She further stated that Ms. F. would not take her baby from the hospital no matter what it took.
On 4-17-95 and the following day, Ms. F. attempted on numerous occasions to contact Lawrence and Memorial Hospital Social Worker Jean W. to inform her of Ms. M. statements and to inquire as to how Samantha was doing. On 4-19-95, Ms. F. did discuss the case with Ms. W. and she stated that she and Dr. W. both felt that Samantha B. was at imminent risk of injury due to her mother's statement, her mother's limited mental abilities, and her mother's spontaneity. She further stated that the hospital would not be able to provide one to one supervision of the parent's during visitation with the baby to ensure the safety of the child. It was their recommendation that the department file for Orders Temporary Custody immediately. She further stated that the parents would be in that evening to visit the baby and that they would not be able to provide adequate supervision during the visit. She also stated that she could not prevent the parents from visiting without adequate supervision. Ms. W. stated that the hospital staff and security would not be able to protect the baby or keep her parents from harming her during visits, putting her of imminent risk of CT Page 13235 being hurt.
On 4/19/95, a 96-Hour Hold was Invoked on Samantha B. in order to ensure the child's safety. The department will need to further assess the situation and provide the parents with supervision for visitation with Samantha.
Samantha B. will be in the hospital for another two weeks before she is ready for discharge. She will need occupational therapy upon discharge, with the possibility that she may also need oxygen and an apnea monitor.
The department has numerous concerns about Samantha's safety both while she is in the hospital and if she were to be released to her mother's care. These concerns surround mother's limited abilities, father's past sexual abuse history, mother's living conditions and plans for the child, as well as the child's medically fragile status.
REASONABLE EFFORTS;
Prior to the 96-Hour Hold Invoked on 4-19-95, Ms. M. and Mr. B. were receiving "hands-on" instruction on how to care for Samantha by Lawrence and Memorial Hospital.
Both parents report to be involved in counseling, and had been visiting on a consistent basis.
Due to the nature of the danger presented to Samantha, other services were not provided at this time. Samantha is not due for discharge from the hospital for another two weeks and her specific medical needs are being assessed. It is safe to assume that she will need Occupational Therapy, with the possibility that she will need Oxygen and an Apnea Monitor upon discharge. Further assessment of parents is needed in order to be able to address services that will be beneficial to them.
Submitted By:
Kathleen F. Social Worker Department of Children and Families
Reviewed By:
Kim N., Social Work Supervisor Department of Children and Families
Approved By: CT Page 13236
Charles L., Program Supervisor Department of Children and Families
KF/jp 4-20-95